**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-11092 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| ROBERT A. MCDONALD, Secretary of | ) | |
| the Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant's motion for summary judgment [55]; Defendant's motion to amend its Rule 56 statement [59]; and Plaintiff's motion to file a sur-reply [73] . For the reasons set forth below, Defendant's motion for summary judgment [55] is granted in part and denied in part. Defendant's motion to amend its Rule 56 statement [59] is granted. Plaintiff's motion to file a sur reply [73] is granted. The case is set for further status on February 11, 2020 at 9:00 a.m.

## I.    Background

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [57–59][1]; [67]. The Court construes the facts in the light most favorable to the nonmoving party—here, Plaintiff. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013). Plaintiff's response to Defendant's statement of facts and statement of

---

[1] Defendant's motion to amend or correct its Rule 56 statement [59] by attaching the final transcript of an outstanding deposition is granted.

additional facts [67] raise several evidentiary issues that must be addressed before turning to the facts themselves. See generally [71]; [72].

## A.    Objections to Exhibits

In its reply [71] on its motion for summary judgment, Defendant issued a broadside attack on Plaintiff's Local Rule 56.1 submission. Defendant argues that he was sandbagged: many of Plaintiff's exhibits were generated by Plaintiff's counsel in other lawsuits and, according to Defendant, were not tendered during discovery, and thus should be stricken. Plaintiff counters[2] that most of the witnesses' names or documents were, in fact, disclosed to Defendant, so they have minimal grounds for complaint. Moreover, Plaintiff argues, Defendant admits most of the facts contained in the exhibits, so their inclusion is harmless.

Rule 37(c)(1) requires that if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In the alternative, the Court may compel payment of attorney's fees or impose "other appropriate sanctions." *Id.*; see also *Musser v. Gentiva Health Services*, 356 F.3d 751, 755, 759–60 (7th Cir. 2004) (explaining that the "exclusion of nondisclosed evidence is automatic and mandatory under Rule 37(c)(1)," but alternatives are appropriate where exclusion would be outcome determinative). Rule 26, in turn, provides that in addition to making initial disclosures of all individuals with discoverable information and documents that may be used to support its claims and defenses, litigants must supplement disclosures "in a timely manner if the

---

[2] Plaintiff moved [73] to file a sur reply [73-1] justifying its inclusion of the contested exhibits. Because (1) the Court has discretion to approve of surresponses, *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 439 (7th Cir. 1999), and (2) the sur-reply responds directly to arguments first made in Defendant's reply brief, Plaintiff's motion to file a sur reply [73] is granted and the Court has considered such materials as appropriate.

party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing." See Fed. R. Civ. P. 26(a) & (e).

The Seventh Circuit has observed that striking exhibits on a motion for summary judgment is "a fairly harsh remedy." *Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 731 (7th Cir. 2004). Thus, a district court may "properly" refuse to strike if the allegedly sandbagged party admits the pertinent facts. *Id.* at 732. Likewise, mentioning another witness with discoverable information during a deposition is enough to satisfy Rule 26(e)'s supplementation requirement; that is, a district court's refusal to issue sanctions is appropriate even if the sandbagger withheld the witness's name at the initial stages of discovery and disclosed it later. Compare *id.* at 732–734, with *id.* at 742 (Wood, J., dissenting); see also *Westefer v. Snyder*, 422 F.3d 570, 584 (7th Cir. 2005) (suggesting that courts should construe the notice provision liberally); *Barnes v. Black*, 2008 WL 11366274, at *2 (C.D. Ill. Sept. 25, 2008) (refusing to exclude witness, although the party's "identification of [the witness] was indefinite and not positive"); but see *Karum Holdings LLC v. Lowe's Companies, Incorporated*, 895 F.3d 944, 951–53 (7th Cir. 2018) (excluding witness testimony when disclosures misrepresented that witness was not an expert); *United States v. Dish Network, L.L.C.*, 2016 WL 29244, at *11 (C.D. Ill., Jan. 4, 2016) (excluding testimony when potential witnesses were mentioned, but the context did not make clear that they had potentially discoverable information). At that point, it becomes counsel's "strategic decision" whether or "not to go forward with depositions" of named witnesses. *Se-Kure Controls, Inc. v. Vanguard Products Group, Inc.*, 2007 WL 781253, at *9 (N.D. Ill. Mar. 7, 2007). In sum, "[i]n the normal course of events, justice is dispensed by hearing of the cases on their merits." *Musser*, 356 F.3d at 759 (quotation marks

and citations omitted). Accordingly, the Court's Case Procedures note that "[m]otions to strike all or portions of an opposing party's Local Rule 56.1 submission are disfavored."

Preliminarily, the basis of almost all of Defendant's objections are unclear, as Plaintiff apparently provided the names of several of these witnesses or the disputed documents during discovery.[3] Defendant objects to Plaintiff's exhibits[4] 1 (Donald Barnes's affidavit), 4 (Xavier Rowe's declaration), 5 (Plaintiff's declaration), 10 (Eddie Borja's rebuttal statement); 17 (vacancy announcement); 28 (Michael Unthank's affidavit); and several of Gary Marsh's deposition testimonies from other cases (exhibits 6, 14, 23, 29, and 37). Plaintiff's initial disclosures, however, listed Barnes, Borja, Marsh, and Plaintiff as individuals with potentially discoverable information. See [76 at 15–16]. These statements (Plaintiff's exhibits 1, 5, 6, 10, 14, 23, 29, and 37) should not be stricken, as Plaintiff disclosed these witnesses. Fed. R. Civ. P. 37(c).[5] Likewise,

---

[3] Ironically, Defendant is partially guilty of the wrong that it accuses Plaintiff of—copying and pasting materials developed for one case in another. Defendant's reply in this case includes sections that are almost identical to its reply in a similar case, also brought by Plaintiff's counsel. Compare [71], with Case No. 17-cv-9258 [40]. Defendant has even attached a copy of the forty-page opinion granting summary judgment in that case to its reply. See generally [71-1]; *Rowe v. Shulkin*, 2019 WL 2060951 (N.D. Ill. May 9, 2019). The discovery dispute in *Rowe*, however, was quite dissimilar from that at issue here: In *Rowe*, seven documents were excluded, including three "declaration affidavits of witnesses that Plaintiff never identified in his initial (or any supplemental) MIDP disclosures." *Rowe*, 2019 WL 2060951, at *2. As discussed below, however, Plaintiff *did* identify almost all the witnesses or documents that Defendant wants excluded. Accordingly, *Rowe* is largely inapposite. To the extent that *Rowe* is relevant, however, the Court notes that in *Rowe*, Defendant sought to exclude several documents that were obliquely referenced, but those documents were ultimately included. Compare No. 17-cv-9258 [40 at 5 n.3 (requesting exclusion of exhibits 15–17, 20, and 22)] with *Rowe*, 2019 WL 2060951, at *11 n.8 (considering those documents even though they were not identified "in great detail").

[4] Plaintiff filed all 39 of his exhibits as a single, 534-page attachment. Thus, when referencing specific pages in this tome, the Court refers to the page number out of 534 as opposed to exhibit number.

[5] As clarified below, Marsh's various depositions are quite important to Plaintiff's summary judgment defense and thus exclusion would be a drastic remedy. *Musser*, 356 F.3d 759–60. Even if Plaintiff should have tendered copies of these documents, the failure to do so was harmless. There is little that more discovery regarding Marsh could accomplish—his prior deposition testimony is set in stone, and to the extent that Defendant would have proffered further testimony or affidavits that contradicted or contextualized it, Plaintiff (as the nonmovant) would be entitled to the benefit of the doubt in terms of how to resolve any contradictions. Accordingly, the Court will not exclude Marsh's depositions.

Plaintiff claims that he tendered Borja's rebuttal statement (exhibit 10), Unthank's affidavit (exhibit 28), and a copy of the email with the job posting during discovery (exhibit 17), and has attached Bates-stamped copies of these documents to its sur-reply. See generally [73-6]; [73-7]. Based on Plaintiff's exhibits and representations, Defendant's objection to these documents is not well taken. And, during discovery Plaintiff tendered an affidavit from Xavier Rowe that is almost identical to the one to which Defendant objects. Compare [73-6 at 35], with [67-1 at 23–25]. Defendant could hardly be prejudiced given that it knew (1) that Rowe would have something to say, and (2) the general substance of Rowe's statement. Moreover, Rowe's name came up repeatedly during Marsh's deposition in this case, see, *e.g.*, [59-1 at 80–86], putting Defendant on notice of Rowe's importance. *Gutierrez*, 382 F.3d at 732–34.

Next Defendant objects to the attachment of several judicial opinions (exhibits 3, 8, and 34).[6] The Court does not rely on any of these opinions as underlying any Local Rule 56.1 statements, so it is unnecessary to broach their admissibility. That said, these opinions applied the summary judgment standard to similar facts and are public documents available on Westlaw.

Next, Defendant objects to the inclusion of a deposition transcript by Jodi Yenerall (exhibit 26), an HR officer at the Department of Veteran's Affairs (VA). Plaintiff contends that any deposition of anybody can be attached to a motion for summary judgment, regardless of whether the deponent has been identified as someone with potentially discoverable information. See [73-1 at 8]. Such an exception would swallow Rule 37(c), and, indeed, Rule 26. Plaintiff has not argued that his failure to disclose Yenerall was justified, and the parties dispute facts that rely on her deposition testimony, meaning that it was not harmless. See [72 at 18–19, ¶ 28]; *Gutierrez*, 382 F.3d at 732. Although Defendant was on notice that VA HR policies would be at issue in this case,

---

[6] Respectively, *Borja v. Shulkin*, 2018 WL 6725565 (N.D. Ill. Dec. 21, 2018); *Henderson v. Shulkin*, 720 Fed. Appx. 776 (7th Cir. 2017); *Paoli v. Wilkie*, 2018 WL 4635643 (N.D. Ill. Sept. 26, 2018).

there was no indication that Yenerall had discoverable information, and thus Plaintiff cannot use her deposition, prepared for another case, here. Fed. R. Civ. P. 37(c).

Finally, Plaintiff admits that he did not provide Defendant with the declaration of Benjamin Levy (exhibit 7), or Levy's Equal Employment Opportunity (EEO) file. [73-1 at 9.] Plaintiff argues, however, that Defendant had constructive notice of Levy's existence, and in fact should have produced Levy's EEO file to Plaintiff during discovery. [73-1 at 10.] And, Defendant does not deny the substance of the cited part of Levy's affidavit: that upon an accusation of workplace misconduct, Marsh stripped Levy of his badge and gun, ordered an investigation, moved him to a desk job, and suspended him. [72 at 6, ¶ 7.] Levy's affidavit will not be stricken. First, Plaintiff was arguably justified in not sending it to Defendant; Plaintiff could be "justified in believing that it would be an otiose exercise to provide" Defendant's own EEO files to Defendant, especially because Plaintiff had apparently requested this file during discovery. See *Se-Kure Controls*, 2007 WL 781253, at *9 (citing, *inter alia*, *Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269 272 (1877); *Telemark Development Group v. Mengelt*, 313 F.3d 972, 978 (7th Cir. 2002)); [73-1 at 10 n.3]. Furthermore, Defendant was not prejudiced by its use, given that he admits the underlying facts; the failure to provide Levy's name was thus harmless. *Gutierrez*, 382 F.3d at 732.

In sum, except for Yenerall's deposition, [26], none of Plaintiff's exhibits will be excluded. Each party aggressively disputes the other's Local Rule 56.1 submissions, but these disputes are best discussed with regard to each allegedly disputed fact as it comes up in the briefing.

### B.    Facts

Plaintiff Thomas Johnson ("Plaintiff") has been an employee of the Department of Veterans Affairs (VA) since 2002, when he took a job as a police officer at the Edward Hines, Jr. VA Hospital ("Hines"). [67 at 1–2, ¶¶ 3, 5.] In the years immediately following the commencement

of his employment, he was promoted a couple of times such that by 2005 he attained the level of GS-6. [*Id.* at 2, ¶ 6.] He is 70-years old and is African American. [*Id.* at 1, ¶ 3.] Plaintiff also filed several Equal Employment Opportunity (EEO) claims between 2004 and 2011. [*Id.* at 4, ¶ 9.] Plaintiff claims that there is a long history of racial discrimination at Hines and that it is commonly known as "The Plantation." [67-1 at 27.]

Gary Marsh served as the chief police officer at the Hines facility from April 2013 until April 2018. [67 at 2–3, ¶ 7.] Marsh "often acted as the selecting official for promotions within the police department." [*Id.*] Marsh never served as Plaintiff's direct, second, or third line supervisor. [*Id.* at 4, ¶ 8.] Marsh is white and 66 years old. [*Id.* at 2–3, ¶ 7.] Except for the instant case, all of Plaintiff's EEO complaints predate Marsh's tenure at Hines. [*Id.* at 4, ¶ 9.] Marsh was at the very least generally aware of Plaintiff's EEO history, but the parties dispute the extent to which Marsh remembered the details of Plaintiff's complaints.[7] [67 at 4, ¶ 9.]

Hines uses a Merit Promotion Policy (MPP) for merit-based promotions. See generally [58-5]. The parties dispute the extent to which the MPP is a guideline or comprehensive plan.[8] [67 at 2–3, ¶ 7.] In broad brushstrokes, after applications for a promotion are submitted, HR employees will develop a "certificate" that includes all of the minimally qualified candidates. See [67 at 4–7, ¶¶ 10–13; see also [58-5 at 10–11]. From there, the qualified candidates may be interviewed by a panel, whose members score each candidate separately, or the selecting official may review the

---

[7] Defendant has asked the Court to disregard Plaintiff's response to paragraph 9 of Defendant's Local Rule 56.1 submission. The Court will not do so: Plaintiff merely points out that Marsh testified that he could not *remember* the specifics of the complaints. In fact, Marsh testified that he was "sure that [Plaintiff] would've expressed his concerns about the Hines VA Police." [59-1 at 10–12.] And Plaintiff testified that he discussed his previous EEO complaints with Marsh. [67-1 at 502.]

[8] Plaintiff also uses a stricken deposition to argue that the MPP is mandatory. [67 at 2–3, ¶ 7 (citing Yenerall's deposition).] In any event, Plaintiff's theory of the MPP is unclear, given that in some instances he argues that it must be rigidly followed, but elsewhere recognizes that the selecting official may (at least sometimes) deviate from the MPP's strictures. See [*id.* at 7, ¶ 13].

applications and make a selection without an interview. See [67 at 7–9, ¶¶ 13–15]. At the very least, the MPP requires that evaluators consider up to eight "sources of information" "to the extent [each] is related to the job to be filled: (1) Resume; (2) Appraisals; (3) Supplemental Qualifications Statement; (4) Education; (5) Awards; (6) Training; (7) Outside Activities; [and] (8) Other Tools." [58-5 at 22.][9] When the applications or interviews are scored by a panel, the applicants with the highest aggregate scores are referred to the selecting official (who in all the instances described below was Marsh). Both parties agree that at least in some instances, the selecting official may forgo the promotion panel. [67 at 7, ¶ 13.] The parties dispute the import of panel interviews (if conducted) in making the final promotion decision. [72 at 19–20, ¶¶ 30–31.]

Besides the facts at issue here, Plaintiff draws the Court's attention to several other instances of alleged discriminatory human resources decisions at Hines. First, Marsh has had multiple EEO complaints filed against him by African-American and Hispanic officers related to their non-selection for promotion. [72 at 1–2, ¶ 1.] Several other minority officers have complained that Marsh passed them up for promotions in favor of white applicants. [*Id.* at 3–6, ¶¶ 4–7.] In one instance, a white officer was promoted even though there were allegations that, among other things, he threatened to kill an investigator, was intoxicated on the job, and harassed and stalked another employee. [*Id.* at 5–6, ¶¶ 6.] In contrast, an African-American officer was immediately stripped of his badge and gun upon being accused of misconduct, and was soon thereafter investigated, moved to a desk job, and suspended; the parties dispute, however, the gravity of the misconduct. [*Id.* at 6, ¶ 7.] Marsh has also used questionable language when defending his various

---

[9] Plaintiff argues that Marsh conceded that he has never followed this policy. [67 at 3, ¶ 7.] But Marsh merely noted that he could not remember an instance where an applicant submitted information for each of the eight categories *and* each of the eight categories was relevant to the position. See [67-1 at 137–138]. Likewise, Plaintiff's interpretation of the policy—that the evaluator was *required* to analyze each of the eight factors—is inconsistent with the MPP's own example of how to rate applicants, which shows ratings on only five categories. See [58-5 at 23].

personnel decisions. See, *e.g.*, [67-1 at 144 (defending his desire to keep shifts "Black and white" and opining as to whether Hispanic employees are better thought of as "white" or "Black" and how "an individual that has an oriental background" fits into this framework).]

There is also, at least to some extent, a culture of retaliation at Hines. As is relevant here, Marsh testified that although he had health problems that impeded his work, and was facing a 14-day suspension, he "stayed at Hines because [he] felt committed to stand up against individuals that would file [EEO] complaints for the sole purpose of trying to get money from the agency when nothing was due to them." [72 at 24–25, ¶ 40.] Marsh clarified that Plaintiff was one of the people he felt committed to stand up against. [*Id.*]

Turning to the non-promotions at issue here, during the spring and summer of 2014, the VA posted several job openings for the position of lieutenant in the Hines police force. See [*id.* at 4–7, ¶¶ 10–12]. The parties agree that only two people were promoted to the position of lieutenant, but dispute why some of the openings went unfilled. [*Id.*] Specifically, Defendant maintains that one job posting, initially intended to be for the GS-8 level, was inadvertently posted at the GS-6 level; because of the mistake, the position went unfilled. [*Id.* at 4, ¶ 10.] Plaintiff disputes that this was an error, and instead believes that these postings were refiled to engineer a new certificate that included more white people. [*Id.* at 6–7, ¶ 12.]

The first lieutenant promotion went to Donald Barnes, an African-American sergeant in his mid-forties who had previously been at the GS-7 level. [67 at 5–6, ¶ 11.] Barnes did not have a history of EEO complaints. [72 at 12, ¶ 17.] This posting was only open to people in the GS-7 level, so there were only four certified candidates—three of whom were African-American, and one was Hispanic. [67 at 5–6, ¶ 11]; [72 at 8–9, ¶ 12.] Plaintiff did not qualify for the certificate

because he was a GS-6 level officer at the time. [67 at 5–6, ¶ 11.] Each of the four applicants for this position had to go through a panel interview. [67-1 at 132.]

While all of this was happening, the VA posted another job opening for lieutenant. Six days after a certificate of eligible applicants for that position was posted, the VA posted another opening for lieutenant.[10] [72 at 10–11, ¶ 14.] Unlike the position that ultimately went to Barnes, this opening was not foreclosed to those at lower levels and thus Plaintiff made the certificate of eligible candidates. [72 at 11, ¶ 15.] Indeed, he was only one of two internal candidates who qualified for this slate, but dozens of external candidates also qualified. [72 at 11–12, ¶¶ 15–16.] Rather than interviewing the candidates, as had been done for the first lieutenant position, Marsh simply selected his favorite, Tylor Whitt, for the promotion; Whitt is white, in his mid-forties, and did not have a history of EEO complaints. [72 at 11–13, ¶¶ 16, 18.] The parties do not dispute that Marsh had the authority to make selections without going through the panel process, but Plaintiff argues that Marsh only exercised this right to benefit white applicants, and, indeed, Marsh has explained that he *never* forgoes the panel process. [67 at 7, ¶ 13]; [67-1 at 310.] Marsh claims that he chose Whitt over Plaintiff because, after reviewing each candidate's application, Whitt stood out as the most qualified. [67 at 7, ¶ 13]; see also [59-1 at 60–62.][11] It is undisputed that Whitt had

---

[10] Defendant purports to deny this fact, but cites to nothing in the record. See [72 at 10–11, ¶ 14]. Instead, Defendant cites to its contention that the first posting contained erroneous selection criteria. [*Id.*] Presumably, then, Defendant does not contest the timing of these postings, and instead objects to the causal inference that Plaintiff seeks to draw—that the job was reposted with a few tweaks when Marsh's preferred (white) candidate did not make the cut. In any event, the Court must draw all inferences on behalf of the nonmoving party on a motion for summary judgment.

[11] Plaintiff attempts to dispute the fact that Marsh reviewed the candidates' resumes, applications, experience, qualifications, and performance. See [67 at 7, ¶ 13]. He does so, however, with a citation to Marsh's description of his process, where he described reviewing applicants' resumes. [*Id.*] This is not inconsistent with Defendant's assertion or Marsh's other testimony that he reviewed each candidate's application packet, and thus the fact is admitted. Moreover, Plaintiff has provided even further support for the fact that Marsh reviewed each applicant's resume, qualifications, and experience.

only been with the VA for three years, and had limited policework before his VA tenure.[12] [72 at 11–12, ¶ 16.] Plaintiff had two and a half years of experience as lead officer, and Whitt had only had that position for "a couple of months."[13] [72 at 16, ¶ 25]; [67 at 7–8, ¶ 14.]

Marsh's explanations of his decision-making regarding the Whitt promotion have shifted over time. First, Marsh explained to an employee that when making promotion decisions he "always use[d] a panel so it's not just my personal opinion of individuals." [67-1 at 310]; see also [72 at 19, ¶ 29.] In a similar vein, Marsh also testified that Whitt "went through the panel process. I selected him. He was the highest-scoring individual." [72 at 15–16, ¶ 24.] But, as explained above, Whitt did *not* go through the panel process. [72 at 11–12, ¶ 16.] In a later deposition, Marsh recalled that he did not put Whitt through the panel procedures, but was, at best, fuzzy about whether he had taken notes and what he had done with them. [72 at 12–13, 17–18, ¶¶ 18, 27.] No record of Marsh's decision-making has been uncovered. [72 at 12-13, ¶ 18.] Defendant does not dispute that the MPP requires that Marsh preserve any such notes for two years, which he apparently did not do. [*Id.* at 17–18, ¶ 27.]

---

[12] Plaintiff argues that because of Whitt's limited prior police experience, he did not even meet the minimum qualifications for the lieutenant position, which required "[a]t least one year of specialized experience at the GS-00837-07 or higher grade level or equivalent." [67-1 at 173.] This was not, however, a time in grade requirement, and Whitt easily met this specialized experience requirement. [*Id.* at 173 (defining specialized experience at the GS-00837-07 level to include "experience that may have been gained in work on a police force; through service as a military police officer; * * * in performing criminal investigative duties on a police force; or in other work that provided the required knowledge and skills. Experience must be equivalent to medium to large, regular city police work * * *.")]; [*id.* at 221 (explaining that Whitt's experience included one year on the Denver, CO police force, where his responsibilities included "conducting investigations of felony and misdemeanor crimes, * * * making necessary arrests and processing/transporting prisoners" and six years of military service during which he supervised 30 sailors]; see also *Rowe*, 2019 WL 2060951 at *11.

[13] Defendant only admits that Plaintiff believes that he had two and a half years of experience. [*Id.*] But Plaintiff's statement of fact was not opinion—it is a statement that Plaintiff had that experience. Because Defendant did not dispute it, much less with citations to the record, the Court treats Defendant's nonresponse as an admission. See Fed. R. Civ. P 56(e)(2).

After failing to receive either of the lieutenant promotions, Plaintiff applied for a promotion to the position of sergeant, which had been posted in January 2015. [67 at 8–9, ¶ 15.] Again, Plaintiff made the certificate of eligible applicants. [*Id.*] As one of the seven qualified candidates, Plaintiff was interviewed by a three-person panel, comprised of Dr. Thomas Nutter (white, 47), Edward Jones (African-American, 49), and Sharaine James (African-American, 44); each panelist scored each candidate individually, and the aggregate candidate scores were given to Marsh. [67 at 8–10, ¶¶ 15–16.][14] Marsh promoted the highest scoring applicants, Jeromy Backman and James Gowdy, who each scored 105; the panel awarded Plaintiff a score of only 97. [67 at 10, ¶ 17.] Backman is white and 38 years old, while Gowdy is African American and 55 years old, and neither of the promoted candidates had a history of EEO activity. [*Id.*] None of the panelists knew of Plaintiff's prior EEO activity. [67 at 8–9, ¶ 15.] At some point, Marsh told Lieutenant Barnes

---

[14] Plaintiff argues that the Court should not consider Defendant's exhibits 14 and 15, which contain the raw and aggregated interview scores. [67 at 8–11, ¶¶ 15–17.] Plaintiff argues that the scoresheets are inadmissible because they do not "identify what the scores represent, identify the actual method of scoring or the criteria used, how the scores were calculated, or if they even related to the position at issue." *E.g.*, [67 at 9, ¶ 16]. This is not the first time that Plaintiff's counsel has advanced this argument, and it will not be the first time that it is rejected. See *Rowe*, 2019 WL 2060951, at *1. The sworn statements of Marsh [59-1 at 15], Nutter [58-18], Jones [58-19], and James [58-20], the statements contained in the EEO investigation file [58-17 at 8–10], and Plaintiff's concessions regarding Campbell's role [66 at 4] provide foundation and authentication for the score sheets and establish that they are admissible as business records. See *Rowe*, 2019 WL 2060951, at *1 (admitting the scoresheets as business records). Even if one of the links in the business record chain is weak based on these statements, the Court may still consider the scoresheets on a motion for summary judgment. *Hartford Fire Insurance Company v. Aaron Industries, Inc.*, 2020 WL 91991, at *5 (N.D. Ill. Jan. 8, 2020) (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997), for the proposition that business records may be considered at summary judgment when there is no authenticating affidavit where "it is obvious they could be authenticated and verified at trial"). Plaintiff also implies that any aggregate data is inadmissible, but in fact business records are admissible under FRE 803(6), even if the records consist of aggregate data. See, *e.g.*, *Rowe*, 2019 WL 2060951, at *1; *GC2 Inc. v. International Game Technology, IGT, Doubledown Interactive LLC*, 391 F. Supp. 3d 828, 847 n.7 (N.D. Ill. 2019) (admitting aggregate survey data under the business records exception). Plaintiff further argues that the scoresheets are irrelevant, because Marsh (not the panel) was the final decisionmaker. Even if that is true, though, Marsh testified that he selected Backman and Gowdy because of their superior interview scores; Plaintiff does not dispute this assertion with admissible evidence. See [67 at 10–11, ¶ 17]. Finally, Plaintiff cites his own description of someone else's out of court statement regarding how the scoresheets were compiled to prove that they are inherently untrustworthy. Because the statement is offered for the truth of the matter asserted and does not fall within a hearsay exception, it is inadmissible hearsay, and thus cannot be used to defeat a summary judgment motion. See FRE 801–03; Fed. R. Civ. P. 56.

that, regarding this promotion, he liked to "keep it Black and White." [72 at 2–3, ¶ 2]; [67-1 at 4, ¶ 8.] The parties dispute, however, (1) whether this happened before or after the sergeant selection, (2) Marsh's exact phraseology, and (3) whether Marsh was referring to promotion decisions or his desire to keep shifts diverse by assigning lieutenants and sergeants of different races to work together. See [72 at 2–3, ¶ 2]; [67-1 at 143–44.]

Plaintiff filed an EEO complaint regarding these non-selections, which was denied. [67 at 11–13, ¶¶ 20–23.] Plaintiff filed this suit in December 2015, arguing that he was passed over for the two promotions for illicit reasons. See generally [1]. Soon after this lawsuit was filed, Plaintiff applied for a different GS-7 sergeant position and he was given that promotion. [67 at 10, ¶ 18.][15] Marsh retired in April 2018. [67 at 2–3, ¶ 7.] Count I of the complaint is for failure to promote to the lieutenant and sergeant positions due to race and age discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*, and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.* [1, ¶¶ 29–36.] Count II is for failure to promote to the lieutenant and sergeant positions in retaliation for Plaintiff's prior protected activity (*i.e.*, his EEO complaints). [1, ¶¶ 37–43.] Defendant moved for summary judgment [55]. Plaintiff responded [66–67], citing materials developed in other litigation against the VA. Defendant's reply primarily concerned the validity of Plaintiff's denials of material fact and the appropriateness of citing to materials that had allegedly not been tendered in discovery. See generally [71]. Plaintiff moved [73] to file a sur-reply that addressed the discovery issue, which the Court grants.

---

[15] For some reason, Plaintiff disputes that he was subsequently selected for promotion because he was the best person for the job. [67 at 10, ¶ 18.] Instead, he points to deposition testimony where Marsh explained that Plaintiff was third in line. [*Id.*] In any event, Marsh was clear that there were three vacancies for sergeant, and Marsh used the same slate of candidates to fill each position. [59-1 at 113–14.] Plaintiff has not disputed Marsh's statement with admissible evidence.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. *Id.* In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But Plaintiff "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation and quotation marks omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the

pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

Plaintiff brings a two-by-two matrix of failure to promote claims. He claims that there were two failures to promote—(1) to the lieutenant position and (2) to either of the sergeant positions. And he has two theories for each incident: (1) age and/or race discrimination (Count I) and (2) retaliation for protected activity (Count II).

The Seventh Circuit has recently clarified how to analyze summary judgment in an employment discrimination case:

> "[T]he singular question that matters in a discrimination case is: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). To present this evidence, a plaintiff may utilize the *McDonnell Douglas* "burden-shifting framework." *David v. Board of Trustees of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). "Under this approach, the plaintiff must show evidence that '(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated

employees who were not members of her protected class were treated more favorably.' " *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting *Carson v. Lake County, Ind.*, 865 F.3d 526, 533 (7th Cir. 2017)). "If the plaintiff meets each element of her prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.' " Id. at 719–20 (quoting *Carson*, 865 F.3d at 533).

Notably, the *McDonnell Douglas* framework is not the only method plaintiffs may use to prove their claim. "[It] is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's" age or another proscribed factor. *Johnson*, 892 F.3d at 894. "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of her age." *Skiba*, 884 F.3d at 720 (quoting *Carson*, 865 F.3d at 533) (emphasis in the original). We therefore also assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

*McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367–68 (7th Cir. 2019). The same standards are used in retaliation claims as well. *Id.* at 370 (applying *Ortiz* and *McDonnell Douglas* to a retaliation claim). Because the methods of proof and legal standards for retaliation and discrimination are so similar, the Court handles Counts I and II more or less in tandem, addressing the two non-promotions in turn.

### A.     Lieutenant Promotion

Plaintiff's first failed promotion was into the lieutenant position. He argues that the ultimate selection for the position—Whitt—was not better qualified for the position, and was selected solely because of his race, age, and/or lack of EEO history. Defendant counters that Whitt was not similarly situated to Plaintiff and alternatively proffers non-discriminatory reasons why Whitt was selected. Plaintiff further counters that, regardless, these justifications are pretextual.

Starting with the *McDonnell Douglas* framework, the parties agree on three of the four elements of Plaintiff's prima facie case: Plaintiff was a member of a protected class (here, based

on race, age[16], or protected activity); he met his employer's reasonable expectations; and he suffered an adverse employment action. See [56 at 10–11.] The only contested prong is whether Plaintiff was similarly situated to Whitt. "Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects." *McDaniel*, 940 F.3d at 368–69 (citations and quotation marks omitted). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar*, 513 F.3d 680, 690 (7th Cir. 2008)). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson*, 892 F.3d at 895 (citations omitted).

Here, Plaintiff has presented evidence from which a reasonable factfinder could conclude that he was similarly situated to Whitt. Defendant does not even try to argue that Plaintiff and Whitt did not deal with the same supervisor, were not subject to the same standards, or did not engage in similar conduct. Indeed, both officers were employed at the same level at the Hines VA (GS-6), both had served as lead officer, and Marsh made the single promotion decision at issue here. Instead, Defendant cursorily contends that the two are dissimilar because they have different "background, experience, performance, and qualifications." [56 at 11.] Although it is true that

---

[16] For the purposes of the ADEA, people over forty years of age are considered part of the protected class, and better treatment of a comparator who is "substantially younger" satisfies the similarly situated prong. See, *e.g.*, *Tubergen v. St. Vincent Hosp. and Health Care Center, Inc.*, 517 F.3d 470, 475 (7th Cir. 2008); see also *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) ("[W]e consider a ten-year difference in ages * * * to be presumptively 'substantial.'"). Defendant does not dispute that each of the promoted comparators is "substantially younger" than Plaintiff.

Plaintiff and Whitt do not have literally identical resumes, that is not the test at summary judgment. Even if Whitt's background, experience, performance, and qualifications were superior, which is debatable, see, *e.g.*, [67-1 at 198–206, 210–15], Plaintiff had other qualifications which, taken in the light most favorable to the nonmovant, could counteract Whitt's qualifications: Plaintiff had been with the VA for much longer and had his own leadership experience, including a much longer stint as lead officer at Hines. Accordingly, the Court concludes that a reasonable factfinder could find Whitt's qualifications comparable to Plaintiff's. See *Johnson*, 892 F.3d at 895.

Thus, the ball moves into Defendant's court to come up with a non-discriminatory or retaliatory rationale for not promoting Plaintiff. Defendant justifies the decision by saying that, based on Marsh's document review, Whitt "was the best candidate due to [his] education, supervisory experience, excellent performance, and training." See [67 at 8, ¶ 14] Defendant also argues that Whitt had a "higher ranking" than Plaintiff, but does not explain what "ranking" this refers to. The Court infers that the "ranking" simply refers to Marsh's alleged subjective and undocumented evaluation of Whitt's credentials. Regardless, these justifications are enough to meet Defendant's burden. See *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009).

Thus, to survive summary judgment, Plaintiff must show that his non-selection was pretextual. Pretext "means something worse than a business error; pretext means deceit to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). Defendant's supposedly legitimate justification must be shown to be "a lie." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 464 (7th Cir. 2014). A plaintiff demonstrates pretext "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*,

450 U.S. 248, 256 (1981)). Evidence of the "motivation of the decisionmaker," such as admissions that race was considered, "provide a strong basis for drawing an inference of intentional discrimination." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 722–23 (7th Cir. 2005).

To undermine the credibility of a justification, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar*, 772 F.3d at 465. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (quoting *Rudin*, 420 F.3d at 726). Likewise, deviations from "normal practice" and "unexplained missing records of [the plaintiff's] interview and her scores" are suggestive of pretext. See *Baines v. Walgreen Co.*, 863 F.3d 656, 664–65 (7th Cir. 2017). Finally, a plaintiff can demonstrate pretext by showing that he is *obviously* more qualified than those chosen above him, but the bar is quite high. *E.g.*, *Riley v. Elkhart Community Schools*, 829 F.3d 886, 894 (7th Cir. 2016) ("Evidence of [plaintiff's] qualifications only would serve as evidence of pretext if the differences between her and [the successful hires] were so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was *clearly better qualified* for the position at issue.") (quotation marks and citations omitted). That said, the Court must not act as a "super-personnel department that second-guesses employer policies that are facially legitimate," and must therefore restrict its inquiry into whether the proffered reasons for non-selection are pretextual. *Widmar*, 772 F.3d at 464.

Here, summary judgment is inappropriate because a reasonable fact-finder could conclude that the proffered reasons for preferring Whitt were pretextual. First, Marsh's selection of Whitt

was rife with procedural irregularities. Viewing the evidence in the light most favorable to Plaintiff, the VA's decision to relist several positions suggests a pretextual motive: a reasonable factfinder could conclude that the reason that HR posted several unfilled positions was not because of bureaucratic incompetence, but rather as a pretext to hire a preferred candidate. See *Borja v. Shulkin*, 2018 WL 6725565, at *4 (N.D. Ill. Dec. 21, 2018) (concluding, on a similar record, that "there is at least some evidence giving reason to believe that Chief Marsh was deliberately trying to hire Whitt notwithstanding the fact that" there were more qualified applicants).

Likewise, although the parties do not dispute that Marsh had the authority to make promotions without going through the panel process, he testified elsewhere that he *always* used the panel process. That is, at the very least, Marsh "deviated from the normal practice," which suggests pretext. *Baines*, 863 F.3d at 664. This was a suspicious time to deviate from these procedures, as Marsh had just undergone a search for the same position that identified several qualified minority candidates. And the irregularities do not end there: Marsh's explanations for how and why he chose Whitt vary from his incorrect assertion that Whitt had gone through the panel process, to his acknowledgment that no panel was consulted. A reasonable factfinder could view these shifting explanations as an attempt to cover his tracks. *Hitchcock*, 718 F.3d at 738. To make matters worse, Defendant's unexplained lack of documentation, presumably in violation of internal policy, is circumstantial evidence of pretext. *Baines*, 863 F.3d at 665; [67 at 11, ¶ 19.]

Finally, Marsh's statements regarding EEO retaliation and his race-based staffing decisions "provide a strong basis for drawing an inference of intentional discrimination." *Rudin*, 420 F.3d at 722–23. Defendant does not contest that Marsh singled out Plaintiff for retaliation based on his history of EEO activity. [72 at 24, ¶ 40 (admitting that Marsh said that he stayed at Hines "because [he] felt committed to stand up against individuals that would file complaints," including Plaintiff).

Likewise, although aspects of Marsh's statement about "Black and white" staffing are disputed, the Court must view this evidence in the light most favorable to Plaintiff, which permits the inference that Marsh wanted to promote a white candidate after promoting Barnes, an African-American man, to lieutenant.

This case, then, is quite similar to *Henderson v. Shulkin*, 720 Fed. Appx. 776 (7th Cir. 2017), another case involving a disputed promotion at the VA. In *Henderson*, Marsh had the applicants go through the panel-selection process, but then waited until the scores had expired and then promoted using his own discretionary authority; that said, his ultimate selection for promotion was the highest scorer. *Id.* at 779. The Seventh Circuit refused to grant summary judgment for the agency because the plaintiff adduced evidence that the agency "offered shifting explanations for why Marsh chose [the applicant], because Marsh could not have relied upon the voided panel-selection process, because Marsh gave [the applicant] a noncompetitive appointment instead of posting the vacancy again, and because Marsh has a history of discriminatory conduct." *Id.* at 783.[17] Plaintiff's claims regarding the lieutenant promotion survive summary judgment for similar reasons: Marsh showed discriminatory and retaliatory motive; burned through multiple certificates of qualified applicants; and then prevented a hiring panel from interviewing candidates and instead chose his favorite without any kind of contemporaneous explanation or record. When asked to justify his behavior, his explanations shifted over time. Accordingly, Plaintiff's discrimination and

---

[17] In *Henderson*, the person who was ultimately promoted also "had disciplinary problems" and was not as qualified for the position as other applicants. *Id.* at 778–80. Such evidence, though highly probative, is not necessary to demonstrate pretext; rather, plaintiff need only show that "a discriminatory reason more likely motivated the [defendant] or * * * that the [defendant's] proffered explanation is unworthy of credence." *Blise*, 409 F.3d at 867 (citing *Texas Dept. of Cmty. Affairs*, 450 U.S. at 256 (1981)); see also *Henderson*, 720 Fed. Appx. at 785–86 (explaining that although the plaintiff was ranked seventh by the panel selection process, he still had a viable claim because the VA "fail[ed] to follow its own internal procedures") (citing *Rudin*, 420 F.3d at 723).

retaliation claims (Counts I and II) regarding the Whitt promotion (to lieutenant) can go forward.[18] It is therefore unnecessary to consider the *Ortiz* test.

To counter this conclusion, Defendant argues that Whitt was selected because he had the "highest ranking" of those who applied. [56 at 11.] But the "ranking" is simply Marsh's say-so that he believed Whitt to be the most qualified applicant; indeed, Marsh did not save any contemporaneous notes justifying this characterization, which, of course, militates against taking Marsh's words at face-value. See *Baines*, 863 F.3d at 665. If Defendant were correct that Marsh's post-hoc explanation for his promotion decision must be given determinative weight, then any employer could defeat a discrimination or retaliation claim by simply asserting that based on an undefined and undocumented decision-making algorithm, it made the choice that it thought best. In any event, a reasonable jury may choose not to credit Marsh's testimony given that his explanations regarding the Whitt promotion have shifted, the promotion had procedural irregularities, and Marsh has a history of retaliatory and discriminatory statements and behavior.

### B.     Sergeant Promotion

Plaintiff and Defendant muster the same legal arguments with regards to the contested sergeant promotions: Defendant argues that there are no similarly situated comparators, whereas Plaintiff argues that he was at least as well qualified as those who got the promotion. Next, Defendant argues that Marsh's proffered reason for selecting the other two candidates is legitimate, whereas Plaintiff counters that it was pretextual.

As above, Plaintiff has put forward evidence from which a reasonable jury could conclude that he was similarly situated to the other applicants—namely that they were at the same level

---

[18] A plaintiff need not bring direct evidence of animus to establish pretext. See, *e.g.*, *Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 579–81 (7th Cir. 2003). Thus, though the evidence of retaliatory and racial animus is stronger, Plaintiff has sufficiently demonstrated pretext such that his ADEA claim may also proceed.

within the Hines facility and evaluated by the same panel. He has also put forward evidence of their respective qualifications, showing he has more education and experience at the VA, including his time as lead officer. This is enough to clear Plaintiff's first hurdle. Compare *Johnson*, 892 F.3d at 895, with, *e.g.*, *Skiba*, 884 F.3d at 723 (finding younger hires incomparable when the only information provided about them was their names, ages, and titles); see also *McDaniel*, 940 F.3d at 369 (suggesting that submitting comparators' names in addition to comparable "work history [and] performance reviews" would be enough to survive summary judgment). Defendant's justification for Plaintiff's non-selection was that Gowdy and Backman scored higher on their respective interviews, which is enough to get to the pretext inquiry. *Scruggs*, 587 F.3d at 838.

Turning to pretext, the facts of the sergeant promotion are quite dissimilar from those of the Whitt promotion. There was a single job posting from which seven applicants were selected and interviewed. There is no indication that any of the three interviewers had retaliatory animus or even knew of Plaintiff's history of EEO activity. Likewise, none of the panelists have a history of making racially-charged comments about hiring and staffing. Here, Defendant has provided the raw scores from the interviews, which show how each of the three panelists rated the seven candidates, along each applicant's total score. Marsh testified that he selected the two people with the highest aggregate scores, and the score sheets confirm that Backman and Gowdy scored highest. No one has changed their story regarding the sergeant promotion. Unlike the Whitt promotion, then, Marsh did not swap out multiple certificates of applicants; deviate from the panel process; make an undocumented decision; or provide conflicting information. To the contrary, he followed the panelists' scores. Thus, there is no evidence from which a reasonable factfinder could conclude that Defendant's promotion of the candidates with the better interview scores was a lie.

Plaintiff argues that the scores are pretextual, but it is hard to make out the thread of his argument. As the Court understands it, Plaintiff argues that Defendant toggled back and forth between following the policy and not—when the policy yielded candidates to his liking, Marsh went along with the panel, but when it did not, he freelanced. While it is true that personnel decisions that deviate from the normal procedures may give rise to the inference of pretext, *Baines*, 863 F.3d at 664, Plaintiff has not cited any authority suggesting that any one deviation from normal procedures taints every promotion the decision-maker has ever made, even those that were done by the book. To the contrary, a separate promotion process—"with different facts, individuals, and job announcements at issue—cannot serve as record evidence here that when the VA correctly followed its policy in this case, it did so pretextually." *Rowe*, 2019 WL 2060951, at *11.

Plaintiff's other arguments are unconvincing. First, he argues that he was obviously the better candidate—so much so that a reasonable factfinder could infer pretext from his non-selection. Plaintiff's application reveals that he had the following experiences and qualifications: (1) more than 12 years of experience at the VA; (2) an associate's degree in criminal justice (with a GPA of 3.27); (3) fifteen law enforcement certificates and trainings; (4) up to two years of other law enforcement experience; (5) over twenty years of experience in the insurance industry; and (6) one "excellent" performance review. [67-1 at 191–216]. Gowdy had the following experiences and qualifications: (1) more than four years of experience at the VA; (2) a high school equivalency certificate; (3) 19 law enforcement and military trainings; (4) 14 years of prior police and security experience; (5) 18 years of military experience as an Army electronics maintenance supervisor; and (6) nine military honors. [67-1 at 376–411.] And Backman had the following experiences and qualifications: (1) more than six years of experience at the VA; (2) a high school diploma; (3) six law enforcement trainings and certificates; (4) over three years as a shift supervisor for a private

security firm; (5) four years of military service as a Marine correctional specialist; (6) five military awards; and (7) one "exceptional"[19] performance review. [67-1 at 356–72].

Plaintiff points primarily to his longer tenure at the VA and his having an associate's degree as qualifications that make him superior to the other applicants. But tenure in one's position is only tenuously connected to qualifications for promotion. See *Riley*, 829 F.3d at 894 (granting summary judgment to employer where plaintiff's pretext argument was that "she has many years of teaching experience, has an administrator's license, and performed well in the past, as evidenced by her Teacher of the Year award; nevertheless, [the employer] hired two people with less teaching experience.") Here, Plaintiff's tenure at the VA does not make him "*clearly better qualified* for the position than" Gowdy or Backman. *Id*. Moreover, viewing each candidate's law enforcement experience as a whole, they all spent roughly the same amount of time in law enforcement.

And an associate's degree does not so clearly qualify Plaintiff for this position over Backman and Gowdy, especially considering their other competing qualifications.[20] For example, Plaintiff ignores that both Gowdy and Backman have military service, for which both received multiple awards. [*id.* at 357, 376, 378]. Backman also had three years of supervisory experience, [*id.* at 357], and Gowdy had completed 19 trainings. [*id.* at 376]. Simply put, both Backman and

---

[19] The performance review in question was discretionarily upgraded by Marsh from "fully satisfactory" to "excellent." Though such discretionary decisions must be viewed skeptically, see *Henderson*, 720 Fed. Appx. at 782, it appears as though Marsh had miscalculated the original ranking. See [67-1 at 364–65.] Even if Backman's original ranking required a mere "fully satisfactory" performance review, however, it is undisputed that the review ranked Backman as "exceptional" on most, if not all, of his "critical" tasks. [*Id.*] Thus, his performance record is similar to Plaintiff's. See [*id.* at 201–02, 213–14].

[20] Moreover, Plaintiff's argument that his having an associate's degree makes him a clearly superior candidate would vitiate his argument about Whitt's hiring. Indeed, Whitt had two master's degrees upon being promoted to lieutenant, whereas Plaintiff did not even have a bachelor's degree. Compare [67-1 at 194] with [*id.* at 222].

Gowdy have other qualifications such that Plaintiff is not "*clearly better qualified*" than them.[21]

*Riley*, 829 F.3d at 894. And, as explained above, the interview panel preferred both Gowdy and

Backman to Plaintiff—an additional degree does not render this result utterly meaningless. That

is, even if Plaintiff were better qualified, it was not by such leaps and bounds that a reasonable

fact-finder could infer that Marsh *lied*. See *Widmar*, 772 F.3d at 464.

Next, Plaintiff argues that the Court should not give too much credence to the interview

scores—especially in light of a deposition from Michael Unthank, who once had served as an

interview panelist. [72 at 19–20, ¶ 30.] Unthank stated that, at least in another case, the

interviewers were not given each applicant's materials, and instead asked a series of pre-fab

interview questions. See [72 at 19–20, ¶ 30–31.] Even if the Court adopts Plaintiff's preferred

interpretation of this statement—that Marsh's standard operating procedure was to punt these

personnel questions to a panel that did not have all the facts—that is still not enough to show that

Marsh's selection in this case was pretextual.[22] That is, even if Plaintiff is correct that it would

have been silly for Marsh to rely on underinformed evaluations, there is nothing in the record

suggesting that Marsh *lied*.[23] Rather, Marsh's focus on the interview scores is, at worst, a poor

---

[21] Plaintiff further argues that his record of trainings is superior to Backman's. Maybe so, but it is not so slanted such that no reasonable person could think that the two applicants' qualifications, taken as a whole, were roughly comparable.

[22] And, even viewing the evidence in the light most favorable to Plaintiff, there is undisputed evidence that the sergeant interviews at issue here were substantive, in that "a job description was present" during the interview, and at least two of the interviewers contemplated Plaintiff's "skills, qualifications, and abilities" in their scoring. See [58-18 at 6]; [58-20 at 7].

[23] Indeed, the record demonstrates that the Hines HR department accords the interview scores at least some weight in that HR does not refer low-scoring candidates to Marsh for selection. In the sergeant promotion, seven candidates were interviewed, but only four candidates scored well enough to be passed along to Marsh. [58-14]; [58-15]; [58–16.] Based on a similar record, another court determined that "[i]t is generally Chief Marsh's practice to hire the highest scoring applicant." *Borja*, 2018 WL 6725565, at *1.

decision that cannot be second guessed through litigation. See *Widmar*, 772 F.3d at 464; *Kulumani*, 224 F.3d at 684.

This case is thus quite different than both *Henderson* and Whitt's promotion to lieutenant. In both of those cases, the respective records demonstrated serious deviations from normal procedures followed by shifting explanations as to how and why Marsh landed on his ultimate selection. Here, however, it is undisputed that Marsh referred the applicants to an interview panel, and that Marsh selected the highest scoring applicants from a valid certificate. Likewise, Plaintiff has not put forward any evidence that the panelists have animus toward racial minorities, older employees, or EEO complainants, or any other piece of circumstantial evidence from which a reasonable factfinder could conclude that the VA lied about why Gowdy or Backman were promoted.

Finally, this claim fails the gestalt test outlined in *Ortiz*—simply put, there is not enough evidence here that a reasonable jury could find that Plaintiff was not promoted because of an illicit reason. "For a reasonable factfinder to find in [Plaintiff's] favor, the evidence would have to establish either a causal connection between [Plaintiff's activity or status] and the adverse action he suffered or else support an inference of retaliatory [or discriminatory] motive." *McDaniel*, 940 F.3d at 371 (quoting *Lewis*, 909 F.3d at 871). Although Marsh, the decisionmaker, had a history of questionable statements and potentially discriminatory behavior, the sergeant promotion followed normal procedures, and the scores placing Plaintiff third were not made by Marsh. To the contrary, the scores were given by people who have no documented history of animus and did not know of Plaintiff's history of protected activity. That is, there is no evidence of a causal connection between Plaintiff's race, age, or protected activity and his non-selection. Likewise, there is no evidence that could support the inference that Plaintiff was not promoted due to

retaliatory or discriminatory motive. Accordingly, Plaintiff may not proceed with Counts I and II insofar as they pertain to his non-selection for sergeant.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [55] is granted in part and denied in part; Defendant's motion to amend its Rule 56 statement [59] is granted; and Plaintiff's motion to file a sur-reply [73] is granted. The case is set for further status on February 11, 2020 at 9:00 a.m.

Dated: January 23, 2020

_____
Robert M. Dow, Jr.
United States District Judge